In re Ralph **BORRIELLO**, Debtor.

**Robert Geltzer, as Chapter 7 Trustee of Ralph Borriello, Plaintiff,**

v.

**Jeannette Borriello, Defendant.**

Bankruptcy No. 1–02–10950–dem.

Adversary No. 1–03–01642–dem.

United States Bankruptcy Court,
E.D. New York.

Aug. 23, 2005.

Bryan Cave LLP, New York City, By Robert A. Wolf, Esq., Cari Sommer, Esq., for the Plaintiff.

Hanna & Vlahakis Law Offices, Brooklyn, NY, By Derrick Hanna, Esq., for Defendant.

## DECISION AND ORDER AFTER TRIAL

DENNIS E. MILTON, Bankruptcy Judge.

On September 21, 1987, the debtor and his wife, Jeannette Borriello (the "defendant") purchased real property located at 51 Cottonwood Court, Staten Island, New York (the "Property") for $320,000. On October 22, 1997, the debtor conveyed his undivided one-half interest in the Property, at which they resided, to the defendant (the "transfer"). On January 23, 2002, Ralph Borriello (the "debtor") filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). On November 13, 2003, Robert Geltzer, the Chapter 7 Trustee (the "trustee"), commenced this adversary proceeding against the defendant, alleging that the debtor conveyed his undivided one-half interest

in the Property to the defendant for less than fair consideration and that the debtor was insolvent at the time of the transfer or was made insolvent by it.

The trustee claimed that the transfer constituted a fraudulent conveyance under New York Debtor and Creditor Law ("DCL") §§ 273 and 275. The trustee further argued he could avoid the transfer under Section 278 of the DCL and Section 544(b) of the Bankruptcy Code and that he could recover the net value of the fraudulently conveyed property at the time of transfer from the defendant under Section 550(a) of the Bankruptcy Code.

The defendant argued that third parties had provided fair consideration for the transfer, that the debtor was not insolvent or made insolvent by the transfer, and the debtor acted in good faith in making the transfer.

The Court held a trial on the matter and reserved decision. The Court finds the defendant failed to provide fair consideration to the debtor for the transfer. The transfer occurred at a time when the debtor was insolvent. The debtor's transfer of the property interest to the defendant was a fraudulent conveyance under DCL § 273. The trustee may avoid the transfer of the debtor's one-half undivided interest to the defendant under DCL § 278 and Section 544(b) of the Bankruptcy Code. As set forth in greater detail below, pursuant to Section 550(b) of the Bankruptcy Code, the defendant is liable to the trustee in the amount of $75,000, representing the net equity of the debtor's interest in the real property which he transferred to the defendant.

## JURISDICTION

This Court has subject matter jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2) and the Eastern District of New York standing Order of reference dated August 28, 1986. This decision constitutes the Court's findings of facts and conclusions of law to the extent Fed. R. Bank. P. 7052 requires.

## FACTUAL BACKGROUND

On September 21, 1987, the debtor and defendant purchased the Property for $320,000. *See* Settlement Statement, Pl. Ex. 1. The Borriellos each owned a one-half undivided interest in the Property at the time of purchase. *See* Aff. of the defendant dated May 6, 2002, Pl.Ex. 21. The debtor and the defendant both continue to reside at the Property. Debtor, Tr. at 13, lines 24–25; Tr. at 64, lines 21–22. On October 22, 1997, the debtor transferred his one-half ownership interest in the Property to the defendant, who then possessed a full ownership interest in the Property. *See* Indenture, Pl.Ex. 3, Def. Ex. U; Debtor's Testimony, Tr. at 20, lines 3–18. At the time of the transfer, Citicorp Mortgage, Inc. ("Citicorp") held a mortgage on the Property in the approximate amount of $130,000. *See* Debtor's Testimony, Tr. at 54, lines 15–18. On or about February 17, 1998, the debtor and the defendant jointly submitted a mortgage refinancing application to Citicorp. *See* Uniform Residential Loan Application (the "Application"), Pl.Ex. 2. The Application listed the market value of the Property as $350,000. *Id.*

## PRIOR PROCEEDINGS

On January 23, 2002, the debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. On November 13, 2003, the trustee commenced an adversary proceeding against the defendant by filing the Complaint. The Complaint sought (i) to avoid the transfer under Bankruptcy Code Section 544(b) as an alleged fraudulent conveyance from the debtor to the defendant and (ii) to recover

from the defendant the net value of the Property pursuant to Bankruptcy Code Section 550(a). The trustee contended that the debtor transferred the Property to the defendant while his liabilities exceeded his assets and was insolvent. The trustee also claimed that the debtor had transferred the Property for little or no consideration, in an attempt to avoid repayment of creditors, and intended to incur debts beyond his ability to repay. The trustee also sought recovery from the defendant under a theory of unjust enrichment.

On December 11, 2003, the defendant filed an Answer. She denied that the Property had been transferred for little or no consideration, that the debtor was insolvent or made insolvent by the transfer and that the transfer was an attempt to avoid paying creditors. She further argued that third parties had provided fair consideration for the transfer and that the debtor had acted in good faith in making the transfer.

On October 6, 2004, the Court issued a Decision and Order denying the defendant's motion for summary judgment and dismissing the defendant's counterclaims for sanctions upon the trustee and his retained professionals. On January 25, 2005, the Court held a trial on the matter. On March 10, 2005, the trustee filed his Proposed Findings of Fact and Conclusions of Law. On April 19, 2005, the defendant filed her Proposed Findings of Fact and Conclusions of Law (the "defendant's submission"). On May 3, 2005, the trustee filed his reply to the defendant's submission, at which time the Court reserved decision. This decision follows.

## ANALYSIS

A. The Complaint Is Timely Brought.

■ The trustee seeks to use the avoidance powers of Section 544 of the Bankruptcy Code to avoid the transfer to the defendant. The defendant's first challenge to this exercise of power is an attack on the timeliness of the filing of the Complaint. The transfer which is the subject of this adversary proceeding occurred on October 22, 1997. The trustee filed the Complaint in this adversary proceeding on or about November 13, 2003, more than six years later. The defendant argued that the action has been brought outside the applicable six year statute of limitations, and should be dismissed.

■ An action under New York law to set aside a fraudulent conveyance is governed by the six-year statute of limitation for actions grounded in fraud, commencing at the time of the conveyance. *See Island Holding, LLC v. O'Brien,* 6 A.D.3d 498, 775 N.Y.S.2d 72 (2d Dep't.2004). However, Section 108(a) of the Bankruptcy Code provides an extension of the time for the trustee to act if the statute of limitations has not run as of the petition date:

> If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of (1) the end of such period . . . or (2) two years after the order for relief.

Since the six-year statute of limitations period had not expired as of January 23, 2002, the petition date, and the trustee brought the action within two years of the petition date, the action is timely brought. *In re Luis Elec. Contracting Corp.,* 149 B.R. 751 (Bankr.E.D.N.Y.1992); Code Section 108(a).

B. The Trustee May Set Aside the Transfer as a Fraudulent Conveyance.

Section 544(b)(1) of the Bankruptcy Code provides in pertinent part that the

trustee "may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim ...." New York allows unsecured creditors to avoid certain transfers in its Debtor and Creditor Law. Through Bankruptcy Code Section 544(b), the trustee can take the place of an unsecured creditor and utilize the applicable New York State law provisions set forth in DCL §§ 273, 275, and 278. *Luis Electrical,* 149 B.R. at 757–58. To utilize Section 544(b), the trustee has the burden of demonstrating that a fraudulent conveyance took place under New York State law. *Hassett v. Far W. Fed. Savs. & Loan Assoc. (In re O.P.M. Leasing Servs., Inc.),* 40 B.R. 380, 393 (Bankr.S.D.N.Y. 1984).

■ Under DCL § 273, the trustee can have the transfer set aside as a fraudulent conveyance if he can demonstrate that the defendant provided less than fair consideration for the transfer and the debtor was insolvent or rendered insolvent by the transfer.[1] The trustee has the burden of proof by a preponderance of evidence under this section. *In re Churchill Mortg. Inv. Corp.,* 256 B.R. 664, 677 (Bankr.S.D.N.Y.2000). If the trustee meets his burden as to lack of fair consideration, then it is presumed that the transfer made the debtor insolvent. *O.P.M.*

*Leasing,* 40 B.R. at 393. The burden then shifts to the defendant to rebut the presumption of insolvency. *Id.* If the defendant comes forward with some evidence of insolvency, the burden shifts back to the trustee. *In re Manshul Cons. Corp.,* 2000 WL 1228866, *53. If the trustee meets his burden in proving these elements, the transfer is considered a fraudulent conveyance as to creditors without taking into account the actual intent of the transferor.

■ The trustee can also have a transfer set aside as a fraudulent conveyance under DCL § 275.[2] To establish a fraudulent conveyance under this statute, the trustee must establish that (1) the defendant provided less than fair consideration for the transfer and (2) the transferor intended or believed that he would incur debts beyond his ability to pay them as they matured. *In re All American Petroleum Corp.,* 259 B.R. 6, 17 (Bankr. E.D.N.Y.2001). The trustee has the burden of proof under this section. *U.S. v. McCombs,* 30 F.3d 310, 328 (2d Cir.1994).

If the conveyance is a fraudulent conveyance under either DCL §§ 273 or 275, a creditor may have the conveyance set aside to the extent necessary to satisfy the claim. McKinney's Debtor and Creditor Law § 278.[3] *See also Securities Investor*

1. New York Debtor and Creditor Law Section 273 provides:

 Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

 DCL § 273 (McKinney 2001).

2. New York Debtor and Creditor Law Section 275 (McKinney 2001) provides:

 Every conveyance made and every obligation incurred without fair consideration

when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

3. New York Debtor and Creditor Law Section 278(1)(a) (McKinney 2001) provides in pertinent part that

 [w]here a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has-matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase

 . . .

*Protection Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293 (Bankr.S.D.N.Y.1999)

### 1. The Debtor Did Not Receive Fair Consideration for the Transfer.

██ "Fair consideration" has been held to be the "fair equivalent" or an amount "not disproportionately small as compared to the value of the property [transferred]." *In re Churchill Mortgage Inv. Corp.,* 256 B.R. 664 (Bankr.S.D.N.Y. 2000), aff'd, 264 B.R. 303 (S.D.N.Y.2001). The trustee has the burden of demonstrating that fair consideration was not given for the transfer. *Id.* at 678. To constitute fair consideration, as recipient of debtor's property, the defendant must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; such exchange must be a fair equivalent of the property received; and such exchange must be in good faith. McKinney's Debtor and Creditor Law § 272;[4] *In re Skalski,* 257 B.R. 707, 710 (Bankr.W.D.N.Y.2001). As shown below, the trustee has established that the defendant failed to make a fair exchange for the transfer because the defendant did not transfer a fair equivalent for the value of the debtor's interest in the Property.

The lack of any meaningful consideration set forth in the deed is strong evidence that the defendant provided no such consideration. The deed between the debtor and the defendant transferring the Property reflected a consideration of ten dollars. Indenture, Pl.Ex. 3, Def. Ex. U. In addition, the debtor and the defendant have made sharply inconsistent and contradictory statements concerning the amount of consideration provided to the debtor for the transfer. The debtor and the defendant alleged that different third parties provided either $30,000 or $75,000, for the defendant's consideration. See, e.g., Debtor, Tr. at 26, lines 6–21, at 41, lines 15–24; Defendant, Tr. at 65, lines 18–21.

### a. The DiBenedetto Check Was Not Consideration for the Transfer.

At trial, the debtor contended that the defendant's brother, Rosario DiBenedetto ("DiBenedetto") gave him $30,000 in consideration on behalf of the defendant. Tr. at 26, lines 6–14. The debtor produced a check drawn on DiBenedetto's personal checking account payable to the debtor (the "DiBenedetto Check"). Pl.Ex. 7, Def. Ex. R. The check was dated October 20, 1997, two days before the date of the transfer. The debtor deposited the check into the joint bank account of the Borriellos at Citibank, N.A. (Citibank joint account). Def. Ex. F. Either the debtor or the defendant could use the Citibank joint account without the other's permission or signature. Tr. at 31, lines 8–16. Because the defendant could have used the money received from DiBenedetto without the debtor's permission, it is unlikely that these funds represented consideration to the debtor for the transfer. The form of the payment appears to cast it as a gift or loan from DiBenedetto to the Borriellos

---

(a) [h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim.

4. New York Debtor and Creditor Law Section 272 (McKinney 2001) provides in pertinent part that:

Fair consideration is given for property . . .

a. When in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
b. When such property . . . is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property. . . .

jointly rather than as consideration for the transfer of the Property to the defendant.

The debtor's conduct further reflected that he regarded the DiBenedetto Check as a gift or a loan as opposed to consideration for the transfer of the Property. On October 29, 1997, just seven days after the DiBenedetto Check cleared, the debtor drew a check on the Citibank joint account in the amount of $10,000.00 payable to Connie DiBenedetto, his mother-in-law (the "defendant's mother").[5] *See* Check #2401, Pl.Ex. 8, Def. Ex. N. A review of the Citibank joint account statement established the debtor had insufficient funds in this account for the check to the defendant's mother to clear absent the $30,000 proceeds from the DiBenedetto Check. *See* Pl.Ex. 15, pg. 11, Def. Ex. F. The Borriellos provided no credible explanation for this payment to the defendant's mother.

In addition to the payment to the defendant's mother, the defendant made a second large expenditure shortly after receipt of the DiBenedetto Check. On October 23, 1997, the defendant signed a check on the Citibank joint account payable to RML Tanning Supplies in the amount of $14,568. Pl.Ex. 9. The defendant testified she wrote the check "for tanning supply stuff that [the debtor] was getting for his store." Tr. at 67, lines 4–8. In his testimony the debtor stated he was expanding his business by adding tanning beds to his video store. Tr. at 38, lines 1–5. A review of the Citibank joint account shows that, without the proceeds from the DiBenedetto Check, the defendant and the debtor would not have had sufficient funds to finance this tanning bed purchase. Def. Ex. F.

b. The DiMaria Payment Did Not Constitute Consideration for the Transfer.

At trial, the debtor and the defendant testified that they received an additional $45,000 of the $75,000 in claimed consideration from William DiMaria ("DiMaria"). Debtor, Tr, at 41, lines 15–23; Defendant, Tr. at 71, lines 13–19. At trial, the defendant offered two different explanations for the source of this additional $45,000. The defendant initially claimed that her brother, DiBenedetto, had provided the whole $75,000 consideration:

Q. In return for the transfer of his interest, did you provide your husband with any money of your own?

A. No, my brother gave me some money. $75,000.

Q. It was not money of your own?

A. No.

Q. It was your brother's money?

A. Correct.

Tr. at 65, lines 18–25.

When she prepared her supporting affidavit to her summary judgment motion, the defendant changed the source of this alleged consideration payment of $45,000 from her brother to DiMaria. Defendant's Aff.; Pl.Ex. 22, at ¶ 3. At trial, the defendant repeated this claim: "Mr. DiMaria owed [her brother, DiBenedetto] some money, so he asked Mr. DiMaria to give me the $45,000." Tr. at 71, lines 13–19. She claimed at trial that "[t]he balance was paid a few months later by two separate checks from William DiMaria. Mr. DiMaria had various financial dealing [sic] with my brother and my brother asked him to pay my husband the balance of $45,000 on his behalf." *Id.*

---

5. The defendant testified she could not remember the circumstances surrounding the debtor's $10,000 payment to her mother, ex-

cept that "I know I did not owe my mother any money." Tr. at 68, lines 5–10.

This testimony also conflicted with the defendant's testimony at her deposition on April 15, 2004. At her deposition, she testified that she paid the debtor $75,000 in two installments as consideration for the transfer. Tr. of defendant's deposition ("Deposition"), at 29, lines 4–24, Pl.Ex. 24A. She testified that she paid the debtor the second installment of $45,000 from funds received from her brother several months after the transfer: "My brother lent me the money and I in turn gave it to [the debtor]." *Id.* at 29, lines 9–10. She further testified at her deposition her brother gave her a check, which she thought was probably made out to the debtor and which she personally gave to the debtor. *Id.* at 30, lines 14–24.

The defendant also claimed that at her deposition she had failed to remember that DiMaria had provided her with the $45,000 payment. Tr. at 73, lines 16–23. The defendant's trial testimony regarding this claimed additional consideration was unworthy of belief.

The debtor also gave contradictory testimony regarding this additional $45,000 of claimed consideration. At his deposition, the debtor had stated the defendant handed him the DiBenedetto Check, stating, "[m]y brother-in-law did not give me any money, my wife gave me the money[.]" Debtor's Deposition, Tr. at 53, lines, 4–12, Pl.Ex. 26. At his deposition, the debtor did not mention the $45,000 contribution alleged to have come from DiMaria. At trial, on cross-examination, he testified that "[t]he reason why I did not say anything [at the deposition] about the money [from DiMaria] was because when the checks were given to me, it was going to be hard to explain. I did not want to get DiMaria involved . . ." Tr. at 63, lines 14–21. The Court finds it unlikely that the defendant would not remember the source of such a large sum of money. The debtor

admittedly answered inaccurately and concealed information as to the source of the purported consideration.

The defendant's testimony that "most of [the alleged consideration] was used to pay back my second mortgage that I had[,]" Tr. at 77, lines 3–5, serves to undermine the claim that the defendant paid the debtor fair consideration. The Borriellos allegedly had given a second mortgage to Mary Rose DiMaria ("Mrs.DiMaria"), the wife of DiMaria, in exchange for $70,000 in 1996. Def. Ex. Z. The defendant allegedly repaid the second mortgage with checks she signed from the Borriellos' joint bank account at Independence Savings Bank dated January 29, 1998 in the amount of $20,000 and March 17, 1998 in the amount of $50,000. The defendant's testimony that she used the purported consideration belonging to the debtor to pay a mortgage on the property that belong to her alone is not credible to her claim that the money was consideration.

The Court's examination of the two checks allegedly provided by DiMaria reveals that the checks do not lend support to the testimony of the defendant. The checks are dated approximately three months after the transfer. The first check, dated January 20, 1998 in the amount of $25,000, is from the account of DiMaria, paid to the order of Independence Savings Bank, and not payable to either one of the Borriellos or DiBenedetto. Pl. Ex 19, Def. Ex. S. In the memo section, it states "Borriello ICBC Stock Purchase." This appears to be a payment or loan for some type of business transaction, not consideration for the transfer or the repayment of monies owed by DiMaria to DiBenedetto. The second check in the amount of $20,000, dated January 21, 1998, is also made payable to Independence Savings Bank. This second check is not from DiMaria's account, and contains no men-

tion of the debtor, the defendant, DiBenedetto, or DiMaria. Pl.Ex. 20, Def. Ex. T.

Conflicting with the defendant's testimony that most of the consideration went to pay the second mortgage, the debtor testified that he took the second check and "I went to the Independence Savings office and I put this in my account to buy Independence Savings Bank stock when it became public." Tr. at 53, lines 12–15. The debtor's testimony that he used the second check made out to Independence Savings Bank to purchase stock in the bank, along with the notation on the first check that the money was for a stock purchase, compels the determination that these funds did not constitute the defendant's consideration for the transfer. This conclusion is further buttressed by the debtor's direct testimony that he made the stock purchase in both his name and his wife's name. Tr. at 50, lines 6–22, at 51, lines 22–23.

Upon its review of the evidence, including the record of the debtor's deposit of the DiBenedetto check into the Borriellos' Citibank joint account, the evidence reflecting that the subsequent $45,000 allegedly from DiMaria was given to both the debtor and the defendant for a joint stock purchase or to pay off a mortgage allegedly held on the defendant's Property only, the debtor and defendant's conflicting and changing statements on the matter of consideration for the transfer, the Court declines to accept the debtor's and the defendant's claim that other third party consideration existed for the transfer and finds that the defendant did not provide fair consideration for the transfer.

2. The Debtor Was Insolvent at the time of the Transfer and the Transfer Was Fraudulent under New York Debtor and Creditor Law § 273.

 Since the transfer lacked fair consideration, it is a fraudulent conveyance

if it occurred when the debtor was insolvent or was made insolvent by the transfer. DCL § 273. When Property is transferred for less than fair consideration, it is presumed the transfer made the transferor insolvent. *United States v. Mazzeo,* 245 B.R. 435, 440 (E.D.N.Y.1999). The burden then falls on the defendant to rebut the presumption of insolvency. *Id.; Hassett v. Far W. Fed. Savs. & Loan Assoc. (In re O.P.M. Leasing Servs., Inc.),* 40 B.R. 380, 393 (Bankr.S.D.N.Y.1984).

 New York State DCL § 271(1) (McKinney 2001) defines insolvency as follows:

A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his provable liability on his existing debts as they become absolute and matured.

For purposes of this section, a debt "includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." DCL § 270. *See also In re Manshul Const. Corp.,* 2000 WL 1228866, *53 (S.D.N.Y. 2000). In this case, the defendant has the burden of demonstrating the debtor's solvency. If the defendant comes forward with some evidence of solvency, the burden of persuasion remains with the plaintiff who seeks to set aside the conveyance. *Manshul Const.,* 2000 WL at *53. The defendant's only evidence that the debtor was not insolvent was the testimony of the debtor and the absence of certain documentation relating to the debtor's finances that the trustee did not have because the Borriellos failed to provide them. As it was, the debtor suffered from a bad memory, and repeatedly cited it as a reason for his inability to provide responsive answers:

I am very bad with dates.... When I tell you that my memory is bad, I am

not kidding with you. My memory is bad.

Tr. at 16, lines 15–18, Tr. at 23, lines 20–23.

The trustee's accountant, Andrew Plotzker ("Plotzker"), analyzed the debtor's assets and liabilities and concluded that the debtor was insolvent. Plotzker analyzed all available evidence as to the debtor's assets and liabilities, including the debtor's 100% ownership interest in Montague Street Video, Inc. ("Montague Video") and 68% ownership interest in Video Reflections, Inc. ("Video Reflections"), as well as his bank accounts. After reviewing the debtor's bank statements, credit card related data, tax returns and representations of the debtor, Plotzker submitted a written report dated February 24, 2004 in which he concluded the debtor was insolvent. Pl. Ex. 23. The report stated that the transfer rendered the debtor insolvent by giving him at least $37,965 more in liabilities than in assets. *See* Pl.Ex. 23 at 3, Pl. Post–Trial Submission at 8–11 (setting forth a summary of debtor's assets and liabilities). Plotzker calculated the debtor's monthly disposable income at that time to be $1,839 based on a review of the debtor's income taxes. Plotzker determined the debtor had monthly expenses of $2,410, indicating he could not meet his debts as they came due, based on an examination of the debtor's banking statements and checks written from 1996–1999. Plotzker, Tr. at 123–25. According to Plotzker's analysis, at the time of transfer, the debtor was unable to meet his debts as they came due, had insufficient working capital compared to

his liabilities, and generally had liabilities that exceeded his assets. Pl.Ex. 23.

The debtor disputed the accountant's valuation of his businesses, asserting the inventory in Montague Video to have been worth more. The debtor sought to have the Montague Video inventory, consisting of mostly used videos, assigned a cost value of $90,000. However, Plotzker testified that "my experience in this industry [is] that cost does not reflect the value of that inventory if it were to be sold to a third party or liquidated in a going out of business sale." Tr. at 109. The debtor's own written submission had valued the inventory of Video Reflections at one-third of its cost to him. Pl.Ex. 15. However, for Montague, the debtor sought to apply the entire cost value, without a reduction taking into account the used nature of the videos and the market for such videos. Plotzker thought a value of one-third the inventory cost to be reasonable. Tr. at 110–111. The Court adopts the values for the businesses assigned by Plotzker.[6]

The debtor also disputed the credit card debt Plotzker assigned to him in his report. Rather than $22,769 in credit card debt, the debtor claimed to have had $8,269.38 in credit card debt on the transfer date. However, the debtor did not provide the trustee with all of his credit card information. *See* Pl.Ex. 15, Plotzker's testimony, Tr. at 114, lines 5–22. While the debtor provided evidence that his First USA account balance was $5,769.38, he merely provided "estimated values" for his other two accounts from memory, without supporting documenta-

---

**6.** The debtor testified that several years after the transfer, Montague Video sold for a higher amount than the value Plotzker had assigned. However, the debtor also testified that Montague Video had a greater amount of inventory when sold, because he had transferred some of the inventory of Video Reflections to Montague Video. Tr. at 154–55.

Plotzker also estimated that the debtor's businesses had liabilities such as rent, payroll, and taxes due that exceeded the $10,967 the businesses had in cash. Pl.Ex. 23. The debtor failed to provide any information to Plotzker regarding ongoing video memberships for the two businesses. Tr. at 129–130.

tion. Pl.Ex. 11, 15. The debtor also stated that the total credit card amount was "at most, $22,769.38 if the first two cards [that had no documentation] were 'maxed [out]'." Pl.Ex. 15, p. 2. Under the circumstances, Plotzker was justified in using the higher figure for those two cards, rather than the estimated figure, as the debtor did not know the total debt with any certainty and the defendant failed to meet her burden due to the lack of evidence.

3. The Debtor Transferred the Property with the Actual Intent Or Belief That He Would Incur Debts Beyond His Ability to Pay As They Matured and Thus the Transfer Was Fraudulent.

A transfer of property with the actual intent or belief that one would incur debts beyond his ability to pay is a fraudulent conveyance under DCL § 275. The trustee has the burden of establishing the debtor's intent by a preponderance of the elements. *In re All American Petroleum Corp.*, 259 B.R. 6, 17 (Bankr.E.D.N.Y. 2001). The requirement of actual intent to incur debts beyond the ability to pay of Section 275 is not often susceptible to direct evidence by the trustee and must be gleamed from the circumstances surrounding the alleged fraudulent conveyance. *U.S. v. McCombs*, 30 F.3d 310, 328 (2d Cir.1994)(a requirement of actual intent can be established through an examination of the circumstances surrounding the transaction). These circumstances may include: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *Stratton Oakmont*, 234 B.R. at 315–16, *citing, Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir.1983).

As a general rule, fraudulent intent on the part of the vendor and knowledge thereof on the part of the purchaser may be indicated by the fact that the consideration for the conveyance was not adequate or fairly proportioned to the value of the Property. *Apple Bank for Sav. v. Contaratos*, 204 A.D.2d 375, 612 N.Y.S.2d 51 (2d Dep't 1994). Here, the debtor initially claimed that he transferred the Property to the defendant because they were having marital difficulties. Tr. at 21, lines 9–12. However, the evidence suggested that the debtor actually transferred the Property at a time when he had an actual intent to incur debts he could not pay. As discussed above, the lack of fair consideration is one factor leading toward the determination of an actual intent to incur debts beyond one's ability to pay creditors. The debtor's transfer of the Property to his wife, while he continued to live at the Property, is another factor supporting this determination. In addition, the debtor submitted an application with the defendant to refinance the Citicorp mortgage in February, 1998, only four months after the transfer. Def. Testimony, Tr. at 83, lines 11–16. Therefore, he reaped all the benefits of the Property without the Property being available for his creditors to attach. This transfer occurred at a time when the debtor was admittedly expanding his business to include tanning beds which the defendant purchased very soon after the transfer. Under these circumstances, the Court finds that the debtor actually intended or believed that he would incur debts beyond

his ability to pay at the time of the transfer.

### 4. The Trustee May Recover the Value of the Fraudulently Transferred Property.

 The Trustee may recover the value of the interest in property fraudulently transferred pursuant to Section 550(a) of the Bankruptcy Code.[7] The main issue as to the value of the interest in the Property to be recovered in this case is whether there was a second mortgage on the Property at the time of the transfer. There is a document dated December 3, 1996 labeled mortgage and signed by the Borriellos, purporting to give Mrs. DiMaria a mortgage on the Property. Def. Ex. Z. The document is a standard mortgage document, although the boilerplate language referring to a promissory note and interest was crossed out. The trustee contended that because it was unrecorded and because the boilerplate language was crossed out, that this purported mortgage is really a promissory note, and thus would not count against the net equity of the Property.

 A "mortgage is an interest in land created by a written instrument providing security for the performance of a duty or the payment of a debt." *Moon v. Moon*, 6 A.D.3d 796, 776 N.Y.S.2d 324, 2004 N.Y. Slip. Op. 02460 (App. Div.3d Dep't 2004). A "mortgage is not valid and enforceable unless there is an underlying valid debt or obligation for which the mortgage is intended as security." *Coronet Capital Co. v. Spodek*, 265 A.D.2d 292, 293, 696 N.Y.S.2d 191, 192 (App. Div.2d Dep't 1999). However the absence of a bond or a note is not fatal to the contention that a

mortgage exists, as the bond or note is "not consideration for a mortgage, but rather merely evidence of the obligation." *Kawai America Corp. v. R. Arthur Hilton*, 205 A.D.2d 1021, 1022, 613 N.Y.S.2d 989 (App. Div.3d Dep't 1994). The debt was a loan to the debtors of $70,000 from Mrs. DiMaria. The trustee has not alleged that the underlying debt itself is invalid, only that it was unsecured. Since it is undisputed that the debt is a valid debt and Mrs. DiMaria provided $70,000 in consideration, there is no need for a promissory note, and there could be a mortgage without one. *Id.* at 1022, 613 N.Y.S.2d 989 (finding the defective nature of the promissory note did not invalidate the mortgage so long as the underlying debt itself is valid).

 The trustee has provided no authority for his position that the lack of a note has the consequence of invalidating the mortgage. The mortgage document set forth the terms of the loan, that the loan was secured by the Property, and described the Property in detail. The Borriellos signed mortgage. All of its covenants remain intact. For a mortgage to be valid, it is necessary that there be language indicating that the Property stands as security for a debt. *Hilton*, 205 A.D.2d at 1022, 613 N.Y.S.2d 989. The document specifically states that a mortgage is granted on the Borriellos' Property, as described, which secures the underlying debt of $70,000. That language fulfills the requirement. The failure to record the mortgage does not make it void, though it would affect the priority of a subsequent mortgage or the obligation of a good faith purchaser without knowledge. *Hopper v. Lockey*, 17

---

**7.** Section 550 of the Bankruptcy Code provides in pertinent part that "to the extent that a transfer is avoided under section 544 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property" from the transferee.

A.D.3d 912, 795 N.Y.S.2d 103, 104 (App. Div.3d Dep't April 21, 2005). Since the defendant had actual knowledge of the mortgage at the time of the transfer, and she would take the Property interest subject to the mortgage of Mrs. DiMaria. *See Hochschwender v. Dorlo Corp.*, 25 Misc.2d 700, 211 N.Y.S.2d 948, 951 (Sup.Ct.1960)(holding that since the transferor could not transfer more than he possessed to a transferee with notice of a prior mortgage, the transferee takes the Property subject to that mortgage). Because the defendant had actual knowledge of the mortgage, the Property post-transfer remained subject to the mortgage, and the amount of that mortgage must be subtracted from the amount the defendant would have to pay the debtor as fair consideration for the transfer.

On February 17, 1998, the debtor and the defendant jointly submitted a mortgage refinancing application to Citibank Mortgage, which listed the market value of the Property as $350,000. *See* Uniform Residential Loan Application (the "Application"), Pl.Ex. 2. The parties presented no other proof of value of the Property to the Court. It is not unreasonable for the Court to conclude that the value of the Property on the date of the Transfer was $350,000, as the Borriellos attributed this value to the Property less than four months after the transfer date. Citicorp Mortgage held a first mortgage on the Property. The debtor claimed, in both his written unsworn statements and in his trial testimony that the amount of the Citicorp Mortgage at the time of transfer was $130,000. Pl.Ex. 17; Tr. at 54, lines 15–18. Subtracting the $130,000 value of the Citicorp Mortgage lien from the $350,000 value of the Property leaves a net equity value of $220,000. Subtracting the $70,000 second Mortgage of Mrs. DiMaria leaves $150,000 in net equity at the time of the transfer. The debtor transferred an undi-

vided one-half interest in the Property, or $75,000 in value, for which there was no fair consideration. Therefore, the defendant must turn over $75,000, representing the debtor's fraudulently conveyed one-half undivided interest, to the trustee pursuant to Section 550(a) of the Bankruptcy Code.

C. The Trustee Can Not Prevail on the Claim of Unjust Enrichment.

In the second count of the Complaint, the trustee sought recovery from the defendant under a theory of unjust enrichment. Compl., ¶ 21–25. The trustee alleged that the transfer unjustly enriched the defendant, because she wrongfully received an additional ownership interest in the property that rightfully belonged to the debtor, without the debtor receiving a benefit. *Id.* Under New York law, the trustee seeking an equitable recovery based on unjust enrichment has the burden of proof. *See MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*, 157 F.3d 956, 963 (2nd Cir.1998). The trustee must show that a benefit was conferred upon the defendant by the debtor, and then demonstrate that, as between the two parties, enrichment of the defendant was unjust.

Recovery under unjust enrichment is a recovery in quasi contract. *Id.* at 963. The doctrine of unjust enrichment rests on the principle that a party should not be allowed to enrich himself at the expense of another. *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir. 1984). In the circumstances of this case, the Court finds that the trustee has failed to establish that the defendant enriched herself at the expense of the debtor, despite the presence of a fraudulent conveyance. While the debtor conferred a benefit on the defendant, the Court cannot

conclude that the enrichment of the defendant was unjust as between the two parties. The trustee has failed to argue that the benefit received by the defendant, with respect to the $75,000, was unjust as compared to the debtor. The debtor received a benefit as well, namely, he continued to reside at the Property. He was no longer legally obligated for the taxes on the property or its upkeep and maintenance. Although the debtor remained personally liable on the Citicorp Mortgage, as Plotzker testified, "the mortgagee [Citicorp] most likely could obtain any amounts due from the equity in the house." Tr. 120 at lines 14–17. Therefore, although there was still risk because of his personal liability, the debtor did receive some benefit from the transfer. The defendant may have enriched herself at the expense of the creditors of the debtor, but the creditors were not the parties who conveyed the benefit. *Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F.Supp. 1439, 1446(M.D.Fla.1998)(holding that creditors had not shown they conveyed a benefit unto the defendant, and thus the defendant was not liable under a theory of unjust enrichment, even though the transaction constituted a fraudulent conveyance as to the creditors).

## CONCLUSION

The defendant failed to provide fair consideration for the transfer of the debtor's interest in the Property. The transfer occurred at a time when the debtor was insolvent, or made insolvent, and the debtor had an actual intent or belief he would incur debts he could not pay as they came due, and was fraudulent. The trustee may avoid the transfer of the debtor's one-half undivided interest in the Property to the defendant under DCL §§ 273, 275 and 278 and Bankruptcy Code Section 544(b). The trustee is entitled to recover from the defendant the value of the debtor's transferred interest of $75,000.

IT IS SO ORDERED.